## WESTERN INDEMNITY CO. v. LEONARD et al.   (No. 331–3690.)

(Commission of Appeals of Texas, Section B. March 9, 1923.)

**Master and servant** ⟨⟩375(2)—**Injury to employé boarding train to return home held in "course of employment," within Compensation Act.**

Where a shipbuilding company operated under a contract with the federal government on a cost plus profits basis, and the company's expenses in furnishing railroad transportation to its employés were part of the cost, and an employé, after leaving the train at the place of work and while he was on the railroad right of way, started to return to the train on seeing a signal that there would be no work that day, and was injured in jumping across a ditch between him and the train, the injury occurred in the course of the employment, within Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Course of Employment.]

---

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Proceeding by Effie V. Leonard under the Workmen's Compensation Act, to recover compensation for the death of her husband, opposed by the Universal Shipbuilding Company, the employer, and the Western Indemnity Company, insurance carrier. From a judgment of the Court of Civil Appeals (231 S. W. 1101) affirming a judgment of the district court sustaining an award, the insurance carrier brings error. Affirmed.

Andrews, Streetman, Logue & Mobley, of Houston, for plaintiff in error.

J. G. Donovan and Atkinson & Atkinson, all of Houston, for defendants in error.

HAMILTON, J. From a judgment of the district court of Harris county, sustaining an award of compensation made by the Industrial Accident Board, under the Texas Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), against the Western Indemnity Company, and in favor of Mrs. Effie V. Leonard, for the death of her husband, James Leonard, an employé of the Universal Shipbuilding Company, a "subscriber" as defined in the Workmen's Compensation Act, carrying a policy of insurance with the indemnity company, an appeal was prosecuted by the Western Indemnity Company to the Court of Civil Appeals, which affirmed the judgment of the trial court. ' 231 S. W. 1101. At the date of his injury Leonard was a resident of Houston, Tex. The case was submitted to the court on an agreed statement of facts, from which we quote:

"It is also agreed that due to the fact that the plant of the Universal Shipbuilding Company was several miles distant from the city of Houston, and also to the fact that transportation facilities to such plant were limited, and due to the lack of housing facilities, and to the fact that the time and place there was a scarcity of skilled and experienced labor, it became necessary to provide transportation for the employés of Universal Shipbuilding Company engaged in the work of shipbuilding at its plant in question, and said transportation was in fact provided for said employés to carry them from the Southern Pacific (Grand Central Station) in the city of Houston to said shipbuilding plant, and from said plant on the return trip to said station. At the time of the injuries sustained by said James Leonard, above mentioned, and for a considerable period prior thereto, the transportation of the employés to and from their work was without cost to said employés, the same being carried forward into the cost of building the ships, and the right to have the transportation cost paid, in addition to the daily wage, became and was a part of the contract of employment between the employés, including the said James Leonard and the said Universal Shipbuilding Company. The train upon which said employés were carried to and from their work was operated on a certain fixed schedule, and was not a train exclu-

sively for such employés, but employés of other industries were carried to and from their work thereon, and at the same charge per man. In the case, however, of the shipbuilding employés at the time of the injuries to James Leonard, and for some time prior thereto, the commutation tickets used for the purpose were furnished to its employés by the Universal Shipbuilding Company at its shipyard, said tickets being regularly issued by the federal Railroad Administration, and being paid for to said Railroad Administration by Universal Shipbuilding Company in accordance with the arrangements theretofore made to relieve the employés of the cost of said transportation. The ships were being built by said Universal Shipbuilding Company on a basis of cost plus a percentage computed thereupon as profit, and the additional expense of transporting the men to and from their work was under authority of the Emergency Fleet Corporation, acting for the United States government, included as a part of the cost of building the ships. The trains upon which the employés in question rode, and the tracks upon which they were operated, were in no sense under the control of the Universal Shipbuilding Company, but were under the control of, and operated by, the United States Federal Administration of Railroads, and each and every employé who rode upon such train or trains, thereby became a passenger and occupied the relation of passenger to the federal Administration of Railroads as carrier."

It was also agreed that the Macy Wage Award, a decision, by the Shipbuilding Labor Adjustment Board, as to wages, hours, and other conditions of laborers, including their transportation to and from shipyards, was in effect, and had been adopted by the Universal Shipbuilding Company, and that the transportation actually furnished was furnished to the employés of the shipyard, including Leonard, "by reason of the facts above set forth, and by reason of the contract and agreement between such Universal Shipbuilding Company and its employés, and by reason of the Macy Award," referred to above. It was further agreed that—

"On or about said October 29, 1918, the said James Leonard boarded said train at Houston, Tex., for the purpose of proceeding to the plant of said shipbuilding company, which was several miles distant, and performing his daily duties at such plant. That in due course said train reached the plant of said shipbuilding company, and the said James Leonard, together with several hundreds of the other employés of said shipbuilding company, got off said train and started toward the entrance gate of said shipbuilding company, in order to begin the daily work. That after leaving said train, and before the reaching of said entrance gate, but while yet on the railroad right of way, the said James Leonard and other employés with and around him, were notified by said shipbuilding company by means of a signal used for that purpose that no work would be performed on that day, which signal was given by reason of the fact that at that time it was raining. That the said James

Leonard immediately turned around and started back to said train, and, in order to board said train in order to return to Houston, Tex., jumped across a ditch between him and said train, and that in so doing the said James Leonard received the injuries from which he subsequently died."

All other facts essential to the recovery of defendant in error were agreed upon, if the deceased, James Leonard, sustained the injuries resulting in his death in the course of his employment. Plaintiff in error assigned as error the holding of the courts below, that, under the agreed facts, James Leonard,. at the time of the injuries in question, was engaged in the course of his employment within the meaning and legal effect of the Texas ,Workmen's Compensation Act. The term "injury sustained in the course of employment" as used in this act—

"shall include all injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employé while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere." Chapter 103, pt. 4, § 1, p. 292, General Laws of Texas, Thirty-Fifth Legislature, Regular Session (article 5246—82).

It is agreed, as indicated above, that the relation of employer and employé existed between the Universal Shipbuilding Company and Leonard on the day of his injury.

James Leonard, deceased, went aboard the train at Houston on the morning of his death in the performance of a duty under his contract.

The "transportation of the employés to and from their work was without cost to said employés, the same being carried forward into the transportation cost paid, in addition to the, daily wage became and was a part of the contract of employment between the employés, including the said James Leonard and the Universal Shipbuilding company."

Transportation being a part of his contract of employment, it is clear to us that he was in the employment of the Universal Shipbuilding Company from the time he left Houston until he returned, using the transportation provided both ways. When he reached the plant—the place of leaving the train—and got off the train, there was no break of employment. When the signal was sounded informing Leonard that there would be no work that day, although he was still on the railroad property, he was so near as to be subject to commands and orders of his employer, and, in obedience to such order, given by the signal, he stopped his movement toward the gate of his employer's premises, turned around, and began his efforts to board again the train he had just left. We think the signal that there would be no work that day was equivalent to a signal to board the

248 S.W.—42

train and return to Houston, and that he was acting in obedience to that signal, as well as in conformity with his contract when he received the injuries which resulted in his death. It is not pretended that Leonard was doing something for himself which had nothing to do with his master's business when he received the injuries from which he died. His master's business under the contract was to furnish him transportation back to Houston, and Leonard was merely placing himself in position to receive the benefit of that part of the contract and to enable his master to comply with that part of the contract when the injuries befell him, and was doing so as a result of a signal of his employer. The injuries had to do with, and originated in the business of the employer, and were received by Leonard when engaged in and about the furtherance of the affairs and business of the employer. He was not at the place where he received the injuries for any other reason than the business of his employer. But for his employer's business, so far as the record shows, he would not have been there. He was endeavoring to get away from there as a part of furthering the business of his employer. His employer's business, under the contract, was to provide transportation for him back to Houston, whence he had come on his employer's business solely, and his employer could not perform this business of reconveyance unless Leonard should board the train. In trying to do so, he received the hurts from which he died. These hurts were received in the course of his employment. In the case of Holmes v. Great Northern Ry. Co., [1900] 2 Q. B. (Eng.) 409, 83 L. T. (N. S.) 44, 69 L. J. Q. B. (N. S.) 854, 64 J. P. 532, 48 Week Rep. 681, 16 Times L. R. 412, the deceased was an engine cleaner, and until November 4, 1899, had been employed in that capacity by the railway company at their station at King's Cross. On that day he was told by the foreman that on the following Monday he would have to go to work at a new engine shed which had been built by the railway company at Hornsey, about four miles from King's Cross. Accordingly on Monday he went with a fellow workman by a train from King's Cross to Hornsey, no fare being demanded of them for the journey, and reached Hornsey at 5:45 a. m., his work in the shed beginning at 6 o'clock. At Hornsey station he asked his way to the shed, and was told he could go either by the bridge or the subway. He went by one of these roads, and did a day's work in the shed; it did not appear by which route he went back to the platform after his work was finished. On the following day he again went to Hornsey by the same train, and with other engine cleaners, who were going to the shed across the line in order to save time, that being a shorter route than either the bridge or the subway. While crossing the line, the

deceased was knocked down by an express train and fatally injured. Upon consideration of this case the court said:

"It must be borne in mind that there is a difference between the beginning of a man's employment and the beginning of his work;. for instance, in a coalpit the employment begins as soon as the miner leaves the bank, although he may have some distance to go to his actual work after he has got down the pit. In the present case I think there was satisfactory proof of an implied contract on the part of the appellants to take the deceased from King's Cross to Hornsey, there to find him work, and to take him back again when his day's work was over. Then comes the question, was the deceased being employed on the railway at the time of the accident? In my opinion he was: he was going across the railway to the engine shed. It is contended that he ought to have gone by the bridge or the subway; but in my opinion, when we once get the fact of employment at King's Cross, all the rest follows, unless the appellants are able to make out a case of serious and willful misconduct, which they have not attempted to do."

To the same effect are MacKenzie v. Coltness Iron Co., [1904] 6 Sc. Sess. Cas. 5th Series (Scot.) 8; Fitzpatrick v. Hindley Field Colliery Co., [1901] 4 W. C. C. (Eng.) 7.

The principles of law governing the determination of the question as to when one is acting in the course of his employment so clearly announced by the Supreme Court, speaking through Justice Greenwood, in the cases of Kirby Lumber Co. v. Scurlock (Tex. Sup.) 246 S. W. 76, and Lumberman's Reciprocal Association v. Behnken (Tex. Sup.) 246 S. W. 72, neither of which is yet (officially) published, while not directly applicable to the facts of this case, are fundamentally determinative of it.

We recommend that the judgment of the trial court and Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.